# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HONEYWELL INTERNATIONAL INC.,<br>855 South Mint Street<br>Charlotte, NC 28202,<br><br>                Movant,<br><br>v.<br><br>THE LAW OFFICES OF PETER T.<br>NICHOLL,<br>36 South Charles St., #1700<br>Baltimore, MD 21201<br><br>                Respondent. | Misc. Case No. 1:21-mc-00151-CKK<br><br>Original Proceeding:<br>*Honeywell International Inc. v. North American Refractories Company Asbestos Personal Injury Settlement Trust*, Adv. Proc. No. 21-2097 (Bankr. W.D. Pa.) |

## RESPONDENT'S CONSOLIDATED OPPOSITION TO HONEYWELL'S MOTIONS TO TRANSFER, COMPEL, AND EXPEDITE

# TABLE OF CONTENTS

**Page**

Table of Authorities .................................................................................................... ii

Background ............................................................................................................... 2

I.    The NARCO Trust .............................................................................................. 2

   A.   Trust Procedures ......................................................................................... 3

      1.   Required Exposure Evidence ................................................................ 4

      2.   Audit Procedures ................................................................................. 5

   B.   The Nicholl Firm's Representation of NARCO Trust Claimants ..................... 6

   C.   Audits of Claims Submitted by the Nicholl Firm ........................................ 7

II.   The Underlying Case ......................................................................................... 8

   A.   Honeywell's Non-Party Subpoena to the Nicholl Firm ................................ 9

   B.   The NARCO Trust's Motion for Protective Order and the Bankruptcy
Court's Ruling ...................................................................................................... 11

Argument ................................................................................................................ 14

I.    No Exceptional Circumstances Warrant Transfer to the Bankruptcy Court ......... 14

II.   There is No Good Cause to Expedite These Proceedings .................................... 18

III.  The Court Should Deny Honeywell's Motion to Compel ................................... 19

   A.   Complying with the Subpoena's Expansive Requests Would Impose a
Massive Burden on The Nicholl Firm. .................................................................... 20

   B.   The Burden on the Nicholl Firm Far Outweighs the Minimal Likely Benefit
of the Proposed Discovery. ................................................................................... 23

      1.   Honeywell Does Not Need the Requested Discovery to Prove its Claims in the
Underlying Case ................................................................................................. 24

      2.   The Proposed Discovery is Unreasonably Cumulative and Duplicative ..... 25

      3.   Honeywell Can Obtain Many of the Documents it Seeks from More Convenient,
Less Burdensome, and Less Expensive Sources .................................................. 26

      4.   The Likely Benefit of the Proposed Discovery is Minimal at Best .............. 27

   C.   The Court Should Not Enable Honeywell's Use of the Subpoena
Mechanism for an Improper Purpose. ..................................................................... 28

Conclusion ............................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Achagzai v. Broad. Bd. of Governors*,
　109 F. Supp. 3d 67 (D.D.C. 2015) .......................................................................................... 19

*Buzzfeed, Inc. v. U.S. Dep't of Justice*,
　318 F. Supp. 3d 347 (D.D.C. 2018) ........................................................................................ 23

*Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of the Treasury*,
　No. 1:19-CV-01974 (TNM), 2019 WL 4094563 (D.D.C. Aug. 29, 2019) ....................... 18, 19

*Duck v. S.E.C.*,
　317 F.R.D. 321 (D.D.C. 2016) ................................................................................................ 17

*Google, Inc. v. Digital Citizens Alliance*,
　Misc. No. 15-00707 JEB/DAR, 2015 WL 4930979 (D.D.C. July 31, 2015) .......................... 17

*Herbert v. Lando*,
　441 U.S. 153 (1979) ................................................................................................................. 20

*Hood v. City of Chicago*,
　No. 1:19-MC-00123(APM), 2019 WL 5295169 (D.D.C. Oct. 18, 2019) .......................... 15, 16

*In re Denture Cream Prods. Liab. Litig.*,
　292 F.R.D. 120 (D.D.C. 2013) ................................................................................................ 20

*In re Micron Tech., Inc. Sec. Litig.*,
　264 F.R.D. 7 (D.D.C. 2010) ..................................................................................................... 19

*In re N. Am. Refractories Co.*,
　542 B.R. 350 (Bankr. W.D. Pa. 2015) .............................................................................. 2, 3, 4

*In re Vitamins Antitrust Litig.*,
　198 F.R.D. 296 (D.D.C. 2000) ................................................................................................ 29

*Judicial Watch, Inc. v. Valle Del Sol, Inc.*,
　307 F.R.D. 30 (D.D.C. 2014) .............................................................................................. 15, 18

*Millennium TGA, Inc. v. Comcast Cable Commc'ns LLC*,
　286 F.R.D. 8 (D.D.C. 2012) .................................................................................................... 20

*Strike 3 Holdings, LLC v. Doe*,
　No. 21-cv-2621 (RC/RMM), 2021 WL 4965567 (D.D.C. Oct. 26, 2021) .............................. 26

*Watts v. S.E.C.*,
    482 F.3d 501 (D.C. Cir. 2007) ........................................................................... 19, 20

**STATUTES**

11 U.S.C. § 524(g) ........................................................................................................ 3

28 U.S.C. § 1657(a) ..................................................................................................... 18

**RULES**

Fed. R. Civ. P. 45(d) .................................................................................................. 14

Fed. R. Civ. P. 45(d)(1) ......................................................................................... 19, 23

Fed. R. Civ. P. 45(d)(3)(A)(iv) .................................................................................. 29

Fed. R. Civ. P. 45(d)(3)(iv) ........................................................................................ 19

Fed. R. Civ. P. 45(f) ....................................................................................... 14, 15, 17

**TREATISES**

1 Steven S. Gensler & Lumen N. Mulligan, *Federal Rules of Civil Procedure, Rules and Commentary*, Rule 45 (2021) ................................................................................... 15

Respondent The Law Offices of Peter T. Nicholl ("the Nicholl Firm") hereby opposes Movant Honeywell International, Inc.'s (Honeywell's) Motions to Transfer, Compel, and Expedite Proceedings, filed in this Court on December 6, 2021. *See* Dkt. No. 1. The motions should be denied and this miscellaneous action dismissed.

In 2007, Honeywell, staring down the barrel of thousands of asbestos personal injury tort claims that had already bankrupted its subsidiary, the North American Refractories Company ("NARCO"), struck a deal so that it could exit the tort system with its finances intact. In exchange for funding the NARCO Asbestos Personal Injury Settlement Trust (the "NARCO Trust") and agreeing to abide by the Trust's procedures, Honeywell would be spared the crippling expense of tort litigation and attendant discovery—not to mention potential punitive damages awards. Honeywell's deal, however, required it to give up its own right to discovery from, and cross-examination of, the claimants who sought settlement agreements through the trust. Now, Honeywell evidently believes it found a loophole: non-party discovery in a case against the NARCO Trust.

In a sweeping attempt at obtaining discovery that runs directly contrary to the deal Honeywell made to escape the tort system, Honeywell's non-party subpoena seeks broad categories of documents concerning 1,629 Nicholl Firm clients that settled claims with the NARCO Trust. Locating, reviewing, and producing the requested documents would take many months for the Nicholl Firm to complete, even if the subpoena response became its full-time task, and at great expense to the firm, including by undermining its ability to represent its clients. Honeywell seeks these documents to determine whether they reflect "inconsistencies" with affidavits submitted to the NARCO Trust as evidence of the claimants' exposure to NARCO's asbestos-containing products, on the theory that if Honeywell can find such inconsistencies, it

will strengthen Honeywell's claim for a prospective injunction prohibiting the Trust from accepting certain types of affidavits as reliable evidence (the only claim for relief Honeywell alleges the subpoena relates to). The NARCO Trust's auditor, however, has already conducted approximately 550 audits of Nicholl Firm claims, pursuant to the Trust's established audit procedures, to test whether the claimants met the evidentiary standards required under the governing Trust Distribution Procedures—including detailed review of the evidence of exposure. All audited Nicholl Firm claims passed audit. There is no reason to expect Honeywell's fishing expedition is likely to uncover anything different. The burden the subpoena would impose on the Nicholl Firm far outweighs the negligible benefit the requested documents are likely to bring to the underlying case.

Honeywell also fails to show exceptional circumstances necessitating a transfer of its motion to compel, especially since the issuing court, the United States Bankruptcy Court for the Western District of Pennsylvania, has already expressed a preference for Honeywell's subpoenas to be litigated in the compliance courts. Honeywell likewise fails to show good cause to expedite this proceeding, but that motion is largely moot in light of the briefing schedule the Court has set, pursuant to which the motions will be fully briefed and ripe for review by December 30, 2021.

## BACKGROUND

### I.      The NARCO Trust

The North American Refractories Company ("NARCO") manufactured, sold, and distributed asbestos-containing products for many years. *See, e.g.*, Am. Compl. ¶ 40, Dkt. No. 99, *Honeywell Int'l Inc. v. North American Refractories Company Asbestos Personal Injury Settlement Trust*, Adv. Proc. No. 21-2097 (Bankr. W.D. Pa.) (Oct. 12, 2021) (hereafter, the "Complaint"); *see also In re N. Am. Refractories Co.*, 542 B.R. 350, 352 (Bankr. W.D. Pa. 2015)

(hereafter, "*In re NARCO*").[1] Workers exposed to NARCO products later filed thousands of lawsuits against the company, leading it to file for bankruptcy in 2002. Compl. ¶ 42. The bankruptcy eventually led to NARCO's reorganization and the development of an asbestos trust fund to handle current and future claims (the "NARCO Asbestos Personal Injury Settlement Trust" or the "NARCO Trust"). *Id.* ¶¶ 29, 43.

Honeywell, which owned NARCO from 1979 until 1986, agreed to help fund the NARCO Trust in order to obtain the benefits of a "channeling injunction," entered by the bankruptcy court, which shields Honeywell from litigation and liability in the tort system. *Id.* ¶ 41, 48; *In re NARCO*, 542 B.R. at 353.  The injunction prohibits all NARCO-related litigation against Honeywell from being filed in court (at least in the first instance) and instead channels all such claims into the NARCO Trust. 11 U.S.C. § 524(g); *In re NARCO*, 542 B.R. at 353. The injunction thus provides significant protections to Honeywell, not only from the expense of mounting a defense in multiple suits across the country, but also from the potentially ruinous imposition of punitive damages awards, which the Trust precludes. *See* Ex. 1 (Second Amended North American Trust Distribution Procedures (effective Oct. 4, 2017) (hereafter, "TDP")) at 50 (§ 6.4); Declaration of Caroline E. Reynolds ("Reynolds Decl.") at ¶ 14.

### A.      Trust Procedures

The NARCO Trust is administered according to a detailed set of trust distribution procedures, to which Honeywell agreed. *See generally* Ex. 1 (TDP); *see also In re NARCO*, 542 B.R. at 352-53 (NARCO Trust's governing documents, including TDP "were the product of extensive negotiation among the various constituent groups interested in the case.").

---

[1] Honeywell submitted the Complaint as an exhibit to the Declaration of Guyon Knight in support of its motions. *See* Decl. of Guyon Knight, Dkt. 1-2 (Dec. 6, 2021) at Ex. 2.

### 1.    Required Exposure Evidence

The TDP provides that, in addition to medical evidence sufficient to establish the relevant "disease level," all claims to the Trust must include "requisite evidence of exposure to a specific asbestos-containing produced manufactured, sold or distributed by NARCO or its predecessors." Ex. 1 at 36-39. Proof of exposure requires a showing that asbestos-containing NARCO products were present at the claimant's jobsite, and that the claimant was exposed to those products. *Id*. at 39-40; *see also In re NARCO*, 542 B.R. at 355 (describing the "presence prong and the occupational exposure prong" of the exposure evidence requirement."). Certain types of claims also require evidence of "Significant Occupational Exposure," which requires five years of cumulative occupational exposure to asbestos and can be supported by evidence of exposure to non-NARCO products. Ex. 1 at 40 (TDP § 4.7(b)(2)). The TDP specifies that the NARCO Trust may consider, among other things, "an affidavit of the claimant" or other witnesses as evidence of exposure. *Id*. 40-41 (TDP § 4.7(b)(3), "Exposure Evidence").

The instructions provided by the NARCO Trust on the completion and submission of required Proof of Claim forms give detailed guidance on the exposure-related evidence necessary to support a claim. *See* Ex. 2 (Instructions for Completing the NARCO Asbestos Trust Proof of Claim form for Unliquidated Claims to be Processed under Expedited Review) at 8-11; Ex. 3 (Instructions for Completing the NARCO Asbestos Trust Proof of Claim form for Unliquidated Claims to be Processed under Individual Review) at 12-16; Reynolds Decl. ¶ 15-16. Consistent with the TDP requirements, the instructions do not direct claimants to submit evidence of claims to other asbestos settlement trusts in order to establish occupational exposure. Even with respect to Significant Occupational Exposure, where cumulative exposure may include exposure to non-NARCO products, the instructions explicitly state that "[i]t is not necessary to identify the product(s) to which exposure is alleged." Ex. 2 at 11; Ex. 3 at 15.

4

### 2.      Audit Procedures

The TDP also provides for the NARCO Trust, with Honeywell's consent, to "develop methods for auditing … the reliability of evidence of exposure to asbestos, including exposure to asbestos-containing products manufactured, sold or distributed by NARCO or its predecessors." Ex. 1 at 42 (TDP § 4.8(a)). In addition, the TDP empowers the NARCO Trust to "conduct random or other audits to verify medical and exposure information submitted in connection with this NARCO Asbestos TDP." *Id.*

The TDP grants certain audit rights to Honeywell, as well, providing that Honeywell is "entitled to audit and review all aspects of the NARCO Asbestos Trust, including but not limited to its operations, claims processing procedures, and results." Ex. 1 at 42-43 (TDP § 4.8(b)). The TDP does not, however, permit Honeywell to conduct audits of claims, claimants, or law firms. Nor does it authorize Honeywell to do so outside of the confines of the TDP, as it is apparently attempting to do through its adversary proceeding.

The NARCO Trust, with Honeywell's consent, adopted a detailed set of procedures governing its Claims Audit Program. *See* Ex. 4 (NARCO Trust's first amended Claims Audit Program terms, effective Apr. 6, 2017); Reynolds Decl. ¶ 17. Pursuant to the Audit Program, the NARCO Trust, in consultation with Honeywell, selected Mazars USA LLP ("Mazars") as the Auditor. Williams Decl. ¶ 10.

The Claims Audit Program provides for random audits of submitted claims. Ex. 4 at 2. When a claim is selected for audit, the law firm has 120 days—four months—to provide documentation for the claim, as provided in the Audit Program terms. *Id*. The required documentation includes, among other things, pleadings, interrogatory responses; deposition transcripts; verified work histories, social security records, and all affidavits from the claimant or other witnesses that bear on the claimant's exposure to a NARCO asbestos-containing product

and were submitted by the claimant in support of an asbestos claim. *Id*. at 2-3. The Audit Program directs that the Auditor will review the submitted information to determine, among other questions, whether there is "documentation within the law firm's file to support the reliability of the exposure and medical information submitted to the Trust." *Id*. at 5.

If the Auditor makes any "findings of concern," it must "communicate the details of the findings" not only to the claimant's law firm, but also the Trustees, and request additional information or explanation. *Id. at 5.* The Audit Program also requires the Auditor to inform the Trustees of the "findings and results of the audits," and to "communicate any potentially adverse findings to the law firm." *Id.* at 5-6.

### B.     The Nicholl Firm's Representation of NARCO Trust Claimants

For decades, the Nicholl Firm has represented workers and their family members who were injured by asbestos exposure, in both litigation in the tort system and, as many companies responsible for the asbestos products that created those exposures declared bankruptcy, in claims to asbestos settlement trusts. Williams Decl. ¶ 2. Many of the Nicholl Firm's clients were injured by exposure to NARCO asbestos-containing products. *Id.*

Since 2013, the Firm has submitted approximately 18,000 claims to the NARCO Trust on behalf of its clients. *Id*. ¶ 4. The Trust has reviewed and approved nearly two-thirds of those claims. *Id*. ¶ 5. Approximately 4,165 claims remain pending with the Trust, and the Firm is in the process of working to resolve, to the Trust's satisfaction, "deficiencies" issued in response to those claim submissions. *Id*. ¶ 6.[2]

---

[2] Deficiencies are routinely issued by all asbestos settlement trusts, including the NARCO Trust. Williams Decl. ¶ 7. Deficiencies merely indicate that some piece of required information is lacking in the Trust's view—whether medical evidence, exposure evidence, or even just required information, demographic or otherwise, that must be entered on the claim form. *Id*. Deficiencies

### C.     Audits of Claims Submitted by the Nicholl Firm

To date, the Nicholl Firm has received 550 audit inquiries pursuant to the NARCO Trust's Audit Program. Williams Decl. ¶ 10. These audit inquiries have included both "random" audit inquiries, as well as "targeted" audit inquiries. *Id*.  Each of the 550 Nicholl Firm claims that has been subject to audit has passed the audit. *Id*. ¶ 16.

From the date the NARCO Trust began accepting claims through the present, Nicholl Firm claims have regularly been selected for continued random audits pursuant to the Audit Program. *Id.* ¶ 15. When claim were selected for a random audit, the Nicholl Firm produced to Mazars all the required documents listed in the Audit Program terms (to the extent they existed for a given claimant), and responded to any follow-up inquiries from the audit firm. *Id.* When the claims passed audit, they were then approved for payment. *Id.*

In approximately February 2018, the Firm was notified that the NARCO Trust had directed Mazars to conduct a targeted audit of 15 claims submitted by or on behalf of Nicholl Firm clients. *Id*. ¶ 11. Throughout the year 2018, the Nicholl Firm responded and complied with the audit inquiry, during which time the Trust's processing of all the Nicholl Firm's claims was halted. *Id*.

In response to the targeted audit, the Nicholl Firm also produced to Mazars a comprehensive set of documents related to each claimant (to the extent such documents existed for each person), including but not limited to interrogatory responses, deposition transcripts, verified work histories, social security records, and all affidavits related to the claimant's exposure to NARCO's asbestos-containing products. *Id.* ¶ 12.

---

can be cured by the submission of additional information.  Once a deficiency is resolved, a claim is approved for payment. *Id*.

After reviewing the documentation and, in some cases, requiring responses to follow-up inquiries, Mazars concluded its targeted audit. *Id.* ¶ 13. The Firm was notified in approximately February 2019 that the audit had been completed and that the 15 claims had passed. *Id.* ¶ 13. At some point afterwards, the NARCO Trust resumed processing Nicholl Firm claims. *Id.* ¶ 14.

## II.   **The Underlying Case**

On September 15, 2021, Honeywell filed an adversary proceeding against the NARCO Trust in the United States Bankruptcy Court for the Western District of Pennsylvania, alleging various breaches of trust and mismanagement of trust assets. *Honeywell Int'l Inc. v. North American Refractories Company Asbestos Personal Injury Settlement Trust*, Adv. Proc. No. 21-2097 (Bankr. W.D. Pa.). Honeywell amended its Complaint on October 12, 2021.

Insofar as it relates to the subpoena at issue here, Honeywell alleges that the NARCO Trust has been paying claims without reliable evidence of exposure, despite having stipulated in 2015 to stop accepting certain types of so-called "form" affidavits. *See* Compl. ¶ 1.[3] Specifically, Honeywell alleges that, since February 2018, the NARCO Trust has been paying claims "based on form and check-the-box affidavits," *id.* ¶¶ 12, 115—at least for claimants who worked on an Approved Worksite within the stipulated time frame, *id.* ¶ 116.[4] Count I of Honeywell's complaint alleges that this change in policy constituted an abuse of discretion by the NARCO

---

[3] Honeywell alleges that it previously filed suit against the NARCO Trust challenging various practices, including allegedly "paying claimants based on affidavits that relied on formulaic exposure language contained in pre-printed, boilerplate 'form' affidavits, or that similarly used a non-individualized 'check-the-box' format." Compl. ¶ 5. According to Honeywell, the Trust stipulated in December 2015 that it would "stop accepting certain 'check the box' or 'form' affidavits as sufficient to support a claim," *id.* ¶¶ 8, 84, and adopted written directives to that effect in February 2016. *Id.* ¶ 10.

[4] Honeywell approved a list of 900 work sites at which NARCO's asbestos-containing products were used in specified timeframes. Ex. 2 (TDP) at 39 n.10 & Attachment C.

Trust. *Id.* ¶¶ 215-222.[5]  Honeywell seeks only forward-looking relief with respect to Count I, including declaratory relief and an injunction precluding the Trust from accepting "form affidavits and check-the-box affidavits" in the future. *Id*. ¶ 222.

The Nicholl Firm emphatically disputes that the affidavits submitted in support of its clients' claims with the NARCO Trust ("the Nicholl affidavits") can be characterized as "form affidavits" or "check-the-box affidavits." To its knowledge, the Firm has no claims that rely on "check-the-box affidavits," as it understands the term. Williams Decl. ¶ 8. Additionally, the Nicholl affidavits that have been accepted by the Trust and have resulted in payment of the associated claims contain narrative descriptions of exposure that are unique to the affiant based on the claimant's jobsite, occupation, and observations. *Id*. ¶ 9. Honeywell has acknowledged that it has access to all such affidavits.  These documents can be assessed on their face, and, plainly, none of these affidavits are "form" affidavits.

## A.    Honeywell's Non-Party Subpoena to the Nicholl Firm

On November 9, 2021, Honeywell served the Nicholl Firm with the non-party subpoena at issue on this motion, which demanded compliance within just 15 days. Knight Decl., Ex. 1 (Subpoena to the Law Offices of Peter T. Nicholl) at 2.

*Subpoena Request 1* seeks litigation materials with respect to 1,629 Nicholl Firm clients, including "all" complaints, including amendments, filed by or on behalf of each such client in civil litigation in "any matter relating to allegations of exposure to any asbestos-containing products or raw asbestos fibers"; all transcripts from the depositions of each such client, as well as those of "any person who discussed the [client's] exposure to asbestos, or any other person

---

[5] Honeywell also asserts seven other Counts against the NARCO Trust, but the discovery it seeks from the Nicholl Firm relates solely to Count I. *See, e.g.*, Honeywell Mem. at 8.

who discusses the [client]…"; and all responses to interrogatories, responses to requests for admission, affidavits, declarations, statements, and affirmations by or on behalf of each such client. *See* Knight Decl, Ex. 1 at Schedule A, p. 1 & Schedule C.

*Subpoena Request 2* calls for "all" affidavits, claim forms, declarations, statements, or affirmations alleging exposure to "any" asbestos-containing products or raw asbestos fibers that were submitted by or on behalf of each of the 1,629 Nicholl Firm clients to "any Settlement Trust," as well as "[a]ny and all other Documents" relating to asbestos exposure submitted by or on behalf of each such client to "any Settlement Trust." *Id*. at Schedule A, p. 1-2 & Schedule C.

*Subpoena Request 3* seeks "[a]ll" documents provided by the Nicholl Firm to Mazars "or any person or entity acting on behalf of the trust" in response to "any audit, review, or inquiry by the Trust relating to any of their claim submissions." *Id*. at p. 2.

*Subpoena Request 4* seeks "[a]ll" documents and communications—including attorney notes—concerning "any" meetings, phone calls, or discussions between the Nicholl Firm and "representatives from Mazars." *Id*. at p. 2.

Given the expansive scope of the subpoena, The Nicholl firm requested a brief extension of time to serve its response, but Honeywell refused to grant any accommodation. Ex. 5; Reynolds Decl. ¶ 18. Accordingly, the Nicholl Firm timely served its objections to the subpoena on November 22, 2021. Ex. 6 (Nicholl Firm's objections to subpoena); Reynolds Decl. ¶ 19.

The parties' counsel met and conferred about the subpoena's scope on November 30, 2021. Reynolds Decl. ¶ 3. In that meeting, Honeywell's counsel represented that, contrary to the language of Subpoena Request 2, Honeywell does *not* seek any documents that were submitted to the NARCO Trust on behalf of the Nicholl Firm's clients. *Id*. ¶ 4; *compare* Knight Decl., Ex. 1 at Schedule A, p. 2 (Request 2) (seeking documents submitted to "any" asbestos-related

settlement trust). Honeywell, of course, already has such documents in its possession, custody, and control. Rather, Honeywell exclusively seeks documents submitted to *other* asbestos settlement trusts and documents filed or exchanged in discovery in the tort system (in *any* case) that relate in any way to the Nicholl Firm's clients' exposures to asbestos products or fibers. *Id*. ¶ 5. Honeywell's counsel further stated that, with respect to Subpoena Requests 1 and 2, Honeywell seeks exposure evidence only, not medical evidence. *Id*. Honeywell's counsel agreed to limit the scope of Subpoena Request 3 to claims on the list of 1,629 that were subject to audit requests, as well as the 15 claims that were subject to the targeted audit referenced in Honeywell's complaint. *Id.* These slight alterations in the subpoena's scope, however, did little to reduce the crushing and undue burden compliance would impose on the Nicholl Firm. *See* Arg. § III.A, below; *see also* Williams Decl. ¶¶ 28-61 (describing burden).

**B.      The NARCO Trust's Motion for Protective Order and the Bankruptcy Court's Ruling**

On November 19, 2021, the NARCO Trust filed a Motion for Protective Order in the Honeywell adversary proceeding seeking to quash all thirteen of Honeywell's non-party subpoenas, in their entirety. *See* NARCO Settlement Trust's Motion for a Protective Order, Dkt. No. 125 (Nov. 19, 2021), *Honeywell Int'l Inc. v. North American Refractories Company Asbestos Personal Injury Settlement Trust*, Adv. Proc. No. 21-2097 (Bankr. W.D. Pa.).[6] The bankruptcy court (Thomas P. Agresti, Judge), held a hearing on the motion on December 13, 2021, and subsequently denied the motion. *See* Ex. 7 (excerpts from Dec. 13, 2021 hearing

---

[6] In total, Honeywell served subpoenas on twelve law firms—the twelve firms representing the largest numbers of claimants to the NARCO Trust—as well as on Mazars USA LLP, the firm responsible for conducting audits on the NARCO Trust's behalf pursuant to the TDP. Williams Decl. ¶ 10. At the hearing on the NARCO Trust's motion for protective order, Honeywell's counsel represented that only one firm had agreed to produce documents pursuant to the subpoena. Ex. 7 at 74:21-22.

transcript); Ex. 8 (Order, Dkt. 161 (Dec. 15, 2021), *Honeywell Int'l Inc. v. North American Refractories Company Asbestos Personal Injury Settlement Trust*, Adv. Proc. No. 21-2097 (Bankr. W.D. Pa.)); *see also* Reynolds Decl. at ¶ 21-22.

In denying the NARCO Trust's motion, Judge Agresti indicated his intent to leave the decision about whether to enforce the subpoenas in the hands of the courts where compliance is required. The Court explained that part of its reason for declining to quash all of the subpoenas was that "the subpoenaed law firms are all sophisticated entities that presumably have the expertise and resources to watch out for their own and their clients' interests and to seek their own protective orders if they believe that to be warranted." Ex. 8 (Agresti Order) at 2. Judge Agresti stated his position even more bluntly at the December 13th hearing, declaring: "Let Honeywell litigate the issues in the home courts. Apparently they've got a couple of them already pending where the firms are fighting their requests."" Ex. 7 at 80:1-3. Judge Agresti, moreover, made those statements *after* Honeywell's counsel specifically informed him that this action against the Nicholl Firm is pending in this Court. *See id.* at 74:25-75:2.

In his Order, Judge Agresti took pains to emphasize that "[t]he denial of the *Motion* is not intended to be conclusive with respect to any motion for protective order or similar request for relief that may be filed in any other court by any of the law firms that have been served with the subpoenas that are the subject of the *Motion*." *Id.* at 3. Thus, although the order states that "the subpoenaed material seems to meet the discovery standard for material that is relevant to Honeywell's claim and proportional to the needs of the case …," Ex. 8 (Agresti Order) at 2, Judge Agresti did not intend that observation to bind this Court.

Judge Agresti's statements at the motion hearing further underscore that in ruling on the Trust's motion, the Judge was applying a low, "threshold" relevance standard for discovery. *See,*

*e.g.*, Ex. 7 at 71:7-21 ("But for purposes of discovery and where we are right now, all right, there's a threshold of relevancy that has been met I think … based upon my understanding…"); *id*. at 70:18-19 ("I think there's a, you know, prima facia [sic] relevance based upon what I understand the request is"); *id*. at 69:11-17 (noting court's belief that the nonparty subpoenas seek "relevant information for purposes of proving a couple of points during trial."). As the Judge explained, he viewed the requested discovery as relevant merely because the twelve subpoenaed law firms had submitted claims to the Trust, because the issue before the bankruptcy court is "how these types of claims are being addressed" by the Trust. *Id*. at 71:7-21.

Even though his Order asserts that the subpoenaed discovery "seems to" be proportional to the needs of the underlying case, Judge Agresti's only analysis of that issue—on the record at the hearing—emphasized the limited utility the subpoenaed documents are likely to have. The Judge observed, for example, that "[i]n the context of the trial," the subpoenaed materials "may not be relevant at all," *id*. at 71:18-19, and repeatedly cautioned that Honeywell would be permitted at trial only to present summaries of the materials and would not be allowed to burden the Court with "3,300 deposition transcripts." *Id.* at 64:9-23. The Judge emphasized that Honeywell is seeking only prospective relief, and not to revisit claims previously approved, and suggested he would have granted the motion to quash if that were not the case. *See id.* at 67:1-10; 75:15-18; *see also id.* at 72:17-22 (Honeywell's counsel representing that Honeywell does not seek damages, but rather only an order "reinstat[ing]" a "form prohibition policy," going forward); *id.* at 74:6-11 (Honeywell's counsel asserting that the subpoenaed discovery "goes to this issue of whether the form policy that they used to have" should be reinstated). The Judge, moreover, assured the NARCO Trust that evidence from a law firm's files that the Trust did not actually have when evaluating a claim could not be used against the Trust in the adversary

proceeding. Ex. 7 at 80:21-81:2 (NARCO Trust counsel asking, "how could that be used against us?" and the Court responding, "It can't"). Yet that is all Honeywell is seeking in Subpoena Requests 1 and 2, as narrowed. *See* Bkgnd. § II.A.

Judge Agresti further made clear that the evidence Honeywell is seeking through the non-party subpoenas will ultimately be "meaningless" if Honeywell fails to prove that the Trust reversed its 2016 policy prohibiting the use of "form" affidavits. *See id.* at 78:3-19 (responding to representation from NARCO Trust's counsel that the Trust, in fact, has not reversed the policy). When the NARCO Trust's counsel pointed out that Honeywell's argument in that respect was based on allegations about claims that pre-dated the policy—including about the Nicholl Firm claims subjected to the targeted audit—the Judge noted that, in that case, "Honeywell's point then is not well taken and it's not to be given any weight and in fact, it may be evidence of bad dealing here." *Id.* at 78:21-79:20.

## ARGUMENT

Not only has Honeywell served an unreasonably burdensome subpoena on a non-party, it is also trying to subvert the usual processes for orderly review of subpoenas—which exist to protect non-parties, *see* Fed. R. Civ. P. 45(d)—by rushing this Court to a quick decision and demanding transfer to its preferred venue even though it fails to meet the standard for transfer. The Court should deny each of Honeywell's motions.

## I.    No Exceptional Circumstances Warrant Transfer to the Bankruptcy Court.

Honeywell's motion to compel can be transferred to the Bankruptcy Court for the Western District of Pennsylvania only if this Court "finds exceptional circumstances" warranting a deviation from the usual rule that motions to enforce subpoenas must be filed in the Court where compliance is required. Fed. R. Civ. P. 45(f). In considering a motion to transfer, the Court must not simply "assume[ ] that the issuing court is in a superior position to resolve

subpoena-related motions." *Judicial Watch, Inc. v. Valle Del Sol, Inc.*, 307 F.R.D. 30, 34 (D.D.C. 2014) (quoting Fed. R. Civ. P. 45(f) advisory committee's note to 2013 amendment). Yet that is exactly what Honeywell asks this Court to do. None of its arguments supporting transfer explain why it would be "imprudent for this [C]ourt to rule" on Honeywell's motion to compel. *See Hood v. City of Chicago*, No. 1:19-MC-00123(APM), 2019 WL 5295169, at *3 (D.D.C. Oct. 18, 2019) (denying motion to transfer where "[t]he issues that the parties ask the court to resolve are neither complicated nor so bound up with prior rulings in the underlying case such that it would be imprudent for this court to rule."); *see also see also* 1 Steven S. Gensler & Lumen N. Mulligan, *Federal Rules of Civil Procedure, Rules and Commentary*, Rule 45 (2021) (the reason the issuing court is not presumed to be superior is that "most disputes involving discovery from nonparties present garden-variety issues of relevance, privilege, and burden that do not require deep familiarity with the case because they call only for the application of everyday discovery principles and ordinary judgment").

Honeywell's assertions about why the bankruptcy court is better situated—including the size and complexity of the NARCO bankruptcy proceeding, Judge Agresti's "long history overseeing" disputes over so-called "form filings," and the purported risk of disrupting the underlying case—fall particularly flat in light of Judge Agresti's desire to see any disputes over Honeywell's subpoenas resolved by the "home courts." Ex. 7 at 80:1-2. Judge Agresti clearly rejected the notion that he should be the one to evaluate whether this subpoena should be enforced, and this Court ought to respect his view on the matter.

In any case, Honeywell's arguments do little more than invoke the factors courts typically consider, without explanation of how the factors apply to Honeywell's motion to compel. Honeywell asserts that the NARCO bankruptcy proceeding was large and complex, Honeywell

Mem. at 14, but a decision on whether to enforce Honeywell's subpoena does not implicate the long-closed bankruptcy in any respect. Honeywell suggests the adversary case underlying the subpoena is *also* large, complex, and unique, *id.*, but that is simply untrue. Insofar as it is relevant to the Subpoena, Honeywell's Complaint raises a single issue against a single defendant: whether acceptance of so-called "form" affidavits as evidence of exposure breaches the TDP and/or abuses the NARCO Trust's discretion. *See, e.g.*, Ex. 7 at 74:6-11 (Honeywell's counsel asserting that the subpoenaed discovery "goes to this issue of whether the form policy that they used to have" should be reinstated).  Nor does Honeywell's motion to compel present complex issues or present questions that "rest on facts or law that the [issuing] court is uniquely positioned to decide." *Hood*, 2019 WL 5295169, at *3. Honeywell makes no attempt to show otherwise.

Honeywell's next assertion, that Judge Agresti is better situated to decide the motion to compel because of his purportedly "long history overseeing this dispute," Honeywell Mem. at 14, is similarly beside the point. Honeywell fails to explain why this could possibly matter— again, there are no issues presented here that this Court would be unable to resolve without prior experience with the case.

Honeywell's argument that a transfer is required to avoid the risk of "conflicting rulings concerning the relevance of the documents sought by the Subpoena," Honeywell Mem. at 13, also fails. As explained above, Judge Agresti has already expressed his views on the (marginal) relevance of the documents Honeywell is seeking. Bkgnd. § II.B, *supra*. The Judge's statements, on the record, provide sufficient guidance to this Court to preclude the type of incompatible rulings Honeywell posits. This motion, moreover, will turn not just on a minimal, "threshold" showing of relevance, but on a balancing of relevance, proportionality, and burden—issues that

must be addressed in light of the unique facts presented by this Subpoena to this Firm. *See* Arg. § III, below.  Judge Agresti declined to rule on those issues with respect to the Nicholl Firm, or any of the other subpoenaed law firms. Ex. 7 at 80:1-3. As a result, there is no risk of "conflicting rulings" with respect to the issues actually disputed here.

Honeywell next claims that the adversary proceeding is "likely to be disrupted" if this motion is not transferred to the bankruptcy court, because the court has set an expedited schedule for discovery. Honeywell Mem. at 14. That circumstance, alone, cannot be considered "exceptional"—courts routinely set specific discovery schedules, and transferring subpoena enforcement in all such cases would allow Rule 45(f)'s exception to swallow the rule that enforcement is up to the compliance court. Judge Agresti, moreover, expressed no such concern in directing that Honeywell should "litigate these issues in the home courts." Ex. 7 at 80:1-2. In any event, discovery in the underlying case does not close until March. The Nicholl Firm has sought no extensions of briefing before this Court, and the motion will shortly be ripe for review. Honeywell offers no reason to assume that it would be *less* disruptive to the underlying litigation to stop this proceeding in its tracks and transfer the motion to Judge Agresti.[7]

---

[7] For its transfer argument, Honeywell relies on *Duck v. S.E.C.*, 317 F.R.D. 321 (D.D.C. 2016) and *Google, Inc. v. Digital Citizens Alliance*, Misc. No. 15-00707 JEB/DAR, 2015 WL 4930979 (D.D.C. July 31, 2015).  Neither case supports its position. In *Duck*, transfer was warranted because the subject matter of the subpoena was at issue in a motion "[c]urrently pending in the underlying litigation," briefing on that motion was pending, the underlying action was "complex," the issuing court was "especially well-suited" to rule on the motion to compel because "[t]he underlying case ha[d] been pending for over four years," the issuing court "ha[d] already issued several protective orders" relating to the subpoena, "transfer would avoid interference with [the issuing court's] time-sensitive discovery schedule," while the subpoenaed party—the SEC—would be, at most, "minimal[ly] burden[ed]" because, among other things, one of its relevant offices was mere blocks away from the issuing court. 317 F.R.D. at 324–26. In *Google*, transfer was warranted because, among other reasons, discovery was set to conclude *ten days* after the compliance court issued the transfer order. 2015 WL 4930979, at *3.  As explained above, no similar complexities or threat of disrupting the underlying proceeding exists here.

Finally, Honeywell argues that the Nicholl Firm will suffer no prejudice if this motion is transferred. Honeywell Mem. at 15. But it is not the Nicholl Firm's burden to establish prejudice. Rather, as Honeywell acknowledges, it is Honeywell's burden to prove that the circumstances of its motion to compel are "exceptional." Honeywell Mem. at 6; *see also Judicial Watch*, 307 F.R.D. at 34. Because Honeywell has failed to meet that burden, its motion to transfer should be denied.

## II.   **There is No Good Cause to Expedite These Proceedings.**

Honeywell's request for expedited resolution of its motions to transfer and compel are governed by 28 U.S.C. § 1657(a), pursuant to which the courts "'determine the order in which civil actions are heard and determined,' with only a narrow set of cases that must skip to the front of the line." *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of the Treasury*, No. 1:19-CV-01974 (TNM), 2019 WL 4094563, at *1 (D.D.C. Aug. 29, 2019) (noting that the statute gives priority to actions under the Recalcitrant Witness Statute, actions for temporary or preliminary injunctive relief, criminal cases, and FOIA cases). Outside the narrow set of cases given priority under Section 1657(a), courts may expedite cases only when "good cause therefor is shown." 28 U.S.C. § 1657(a).

Honeywell fails to mention, let alone attempt to meet, the "good cause" standard. *See* Honeywell Mem. at 5, 15-16. The only reason Honeywell offers for expediting a decision on its motions is that its expert reports are due on February 9, 2022, coupled with the assertion that it will need *six weeks* lead time to enable its expert to "make use" of the documents. Honeywell Mem. at 15. Honeywell's insistence that it should be afforded six weeks to review the documents, when it tried to give the Nicholl Firm just 15 days to produce them in the first place, is particularly striking in light of subpoena's scope and the massive burden compliance would impose on the Nicholl Firm. *See* Arg. § III.A, below. Honeywell's position that the Nicholl Firm

should be directed to comply on an expedited basis in order to maximize Honeywell convenience also underscores Honeywell's utter disregard for its obligation to take "reasonable steps to avoid imposing undue burden or expense" on the Nicholl Firm. Fed. R. Civ. P. 45(d)(1). Regardless, the expert deadline in the adversary case—which Honeywell nowhere suggests it has even requested to extend—does not constitute good cause to consider *this* proceeding an emergency requiring immediate action by the Court. *See, e.g.*, *Achagzai v. Broad. Bd. of Governors*, 109 F. Supp. 3d 67, 72 (D.D.C. 2015) (finding plaintiffs' age and poor health did not establish good cause to expedite employment discrimination case in light of court's discretion to manage its docket); *Comm. on Ways & Means*, 2019 WL 4094563, at *2 (importance of congressional committee's request for President Trump's tax returns did not establish good cause to expedite motion to compel compliance with subpoena). Nor does Honeywell's desire to have at least six weeks to analyze the Nicholl Firm's documents in advance of the expert report deadline justify requiring the Nicholl Firm, let alone this Court, to scurry to act on an unreasonably abbreviated timeline.

## III.    The Court Should Deny Honeywell's Motion to Compel

"When a motion to compel is filed, Fed. R. Civ. P. 45 'requires that district courts quash subpoenas that call for privileged matter or would cause an undue burden.'" *In re Micron Tech., Inc. Sec. Litig.*, 264 F.R.D. 7, 8–9 (D.D.C. 2010) (quoting *Watts v. S.E.C.*, 482 F.3d 501, 509 (D.C. Cir. 2007)). *See also* Fed. R. Civ. P. 45(d)(3)(iv) (compliance court "must quash or modify a subpoena that… subjects a person to undue burden."). Rule 45's "undue burden" test "requires district courts supervising discovery to be generally sensitive to the costs imposed on third parties." *Watts*, 482 F.3d at 509. Courts evaluating the burden a subpoena imposes on a non-party must also consider a host of other factors, including:

> whether the discovery is unreasonably cumulative or duplicative; whether the discovery sought is obtainable from some other source that is more convenient, less burdensome, or less expensive; and whether the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

*In re Denture Cream Prods. Liab. Litig.*, 292 F.R.D. 120, 123–24 (D.D.C. 2013) (quoting *Watts*, 482 F.3d at 509). The Court has the "discretion to limit discovery to prevent undue expense" to the Nicholl Firm, "even if the discovery sought is within the permissible scope of Rule 45 and Rule 26." *Millennium TGA, Inc. v. Comcast Cable Commc'ns LLC*, 286 F.R.D. 8, 11 (D.D.C. 2012) (citing *Herbert v. Lando*, 441 U.S. 153, 177 (1979), for the proposition that "the district courts should not neglect their power to restrict discovery where 'justice requires [protection for] a party or person from ... undue burden or expense ....'").

Because Honeywell's subpoena imposes a massive burden on the Nicholl Firm that far outweighs Honeywell's need for the requested documents, the Court should deny the motion to compel.

### A.    Complying with the Subpoena's Expansive Requests Would Impose a Massive Burden on The Nicholl Firm.

The subpoena calls for the Nicholl Firm to locate, review, and produce scores of documents for each of 1,629 claimants, as well as voluminous audit materials for 97 of the claims audited by Mazars under the Claim Audit Program. *See* Bkgnd. § II.A; Williams Decl. ¶ 54; Knight Decl., Ex. 2 (Subpoena) at Schedules A-C. To do so, the Firm's personnel would have to scour electronic and hard-copy records to locate relevant files, most of which the firm does not organize in the manner contemplated by the subpoena; review lengthy transcripts and other discovery materials from hundreds of tort cases to locate responsive material; and

20

download claim forms and claim files from over a dozen (typically more than twenty) different asbestos settlement trusts for each claimant. Williams Decl. ¶¶ 28-58.

To respond to _Subpoena Request 1_, based on its experiences responding to 550 audits of its NARCO Trust claims, the Firm estimates that it would require about an hour, per claimant, for an experienced paralegal to locate and collect the litigation materials responsive to the subpoena. _Id_. ¶¶ 29-33 (describing steps necessary to locate subpoenaed litigation materials in the Firm's files). The burdensomeness of this request should not be a surprise to Honeywell, which agreed to a Claim Audit Program that provides _four months_ for law firms to respond to audit inquiries seeking similar materials in relation to far fewer claimants at a time. _See_ Ex. 4 at 2.

To respond to _Subpoena Request 2_, the Firm's conservative estimate is that, for each individual claimant, it would take at least 8 hours—the equivalent of a full-time work day—for an experienced paralegal to determine which documents had been submitted for each trust claim, locate those documents in the firm's files, download a local copy of the electronically-submitted claim form, and compile the responsive materials. Williams Decl. ¶¶ 39-53 (describing steps necessary to collect subpoenaed trust submission materials in the Firm's files). This estimate, moreover, assumes that the information for these historical claims, some of which could be decades old, are immediately accessible and have not already been "archived" by a trust's processing facility.  _Id_. ¶ 53.

Responding to _Subpoena Request 3_, which seeks the Firm's submissions in connection with the audits of 97 claims, would require the Firm to extract from voluminous audit response materials those that pertain to the 97 responsive claims and redact non-responsive information. Reynolds Decl. ¶ 5; Williams Decl. ¶¶ 54-55. _Subpoena Request 4_ seeks production of all

communications and attorney notes related to any audits, which have occurred routinely over the past eight years. *Id*. ¶ 56. Locating responsive notes and e-mails, to the extent they have been saved at all, would require extensive searching of physical and electronic files of multiple Firm attorneys and staff. *Id.* ¶ 57. Virtually all such materials, moreover, would consist in whole or in part, of privileged communications or attorney work product, which will not be produced in any event, *id*. ¶ 58, making the effort of locating the materials particularly pointless.

Complying with the subpoena, therefore, would require the Nicholl Firm to devote well over 13,000 hours just to collect responsive materials. *See id.* ¶¶ 38, 50-51, 55, 57. Additional time would then be required to review and redact the materials to ensure that the Firm's clients' and other witnesses' personal health information and personally identifying information (like social security numbers) are protected and privileged or other protected information redacted. *Id.* ¶¶ 36, 52, 55, 58.

The Firm has limited personnel and could not devote any of its attorneys or paralegals to this subpoena response, full-time, let alone a team of them, without severely compromising the Firm's ongoing representations of its clients. *Id*. ¶ 59-60. The Firm might be able to save some time by outsourcing some of these tasks to outside counsel, but the time training outside counsel concerning the intricacies of the Firm's files and how to search for and make the connections necessary to locate the documents would in itself still be substantial, and the Firm would incur legal expenses in the hundreds of thousands of dollars. *Id*. ¶ 61.  But even that would not be a complete solution, as the Firm cannot outsource the task of accessing and downloading materials from the trust facilities' web portals—access to which is restricted even within the firm. Giving personnel outside the firm access to these portals would create an intolerable security risk for the Firm and its clients. *Id*. ¶ 49.

Honeywell's reliance on *Buzzfeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347 (D.D.C. 2018) to argue that there is no burden is therefore misplaced. *See* Honeywell Mem. at 11–12. Compliance with the subpoenas there required no more than a "sworn affidavit [answering] three discrete questions, which [could] likely be answered with a simple 'yes' or 'no.'" 318 F. Supp. 3d at 359. "Not a heavy lift," said the court. *Id.* Compliance here could not be more different—by many magnitudes.[8]

## B. The Burden on the Nicholl Firm Far Outweighs the Minimal Likely Benefit of the Proposed Discovery.

Through its subpoena, Honeywell seeks to conduct a sweeping investigation into "all" pleadings, discovery responses, deposition testimony, and claim submissions ever served, filed, or submitted anywhere by or on behalf of 1,629 Nicholl Firm clients—excluding only these claimants' submissions to the NARCO Trust. *See* Bkgnd. § II.A, *supra*. Honeywell argues that the subpoenaed documents are relevant to its allegations that so-called "form affidavits" do not constitute credible and competent evidence of exposure and that the NARCO Trust abused its discretion in relying upon such evidence. Honeywell Mem. at 8. Even if the subpoenaed documents do have some minimal relevance to that claim,[9] the requests are far out of proportion to the needs of the case.

---

[8] Nor should the burdensomeness of compliance be ignored simply because counsel purportedly offered "reasonable limitations" on its subpoena in the meet and confer. Honeywell Mem. at 12. What Honeywell offered was for the *Nicholl Firm* to propose a reduction to the number of claims on Schedule C (it did not commit to accepting any such proposal), and apparently arbitrary limitations on the types of documents responsive to Subpoena Request 1. *See* Reynolds Decl. at ¶¶ 7-8, 10. The Nicholl Firm could not accept these haphazard proposals, which still would have left them with an intolerable burden. In any case, Honeywell had an affirmative duty in drafting its subpoena to avoid imposing undue burden or expense on the Nicholl Firm. Fed. R. Civ. P. 45(d)(1). Honeywell failed entirely to meet that requirement.

[9] Judge Agresti indicated at the hearing on the NARCO Trust's motion for protective order his view that the law firm subpoenas met a threshold relevance requirement merely because the law firms had submitted claims to the NARCO Trust on behalf of their clients. Ex. 7 at 71:14-21.

### 1.    Honeywell Does Not Need the Requested Discovery to Prove its Claims in the Underlying Case.

Honeywell's claim that so-called "form" affidavits are not credible is based in large part on the affidavits themselves, which Honeywell already possesses—for all NARCO Trust claimants, including the 1,629 Nicholl Firm clients listed in the Subpoena. *See, e.g.*, Compl. ¶¶ 92-94 (alleging affidavits are implausible on their face because they contain similar language). The Nicholl Firm strenuously disputes Honeywell's allegations that any Nicholl Firm client's claim rested on a "form" or "check-the-box" affidavit or that any Nicholl Firm affidavits are unreliable on their face. *See* Bkgnd. § II, above. The fact remains, though, that Honeywell does not need any discovery, let alone burdensome third-party discovery, to make arguments about affidavits already in its possession.

Based on its own allegations, Honeywell also does not need the subpoenaed documents to support its argument that "inconsistencies" with other documents that make so-called "form" affidavits unreliable.  Honeywell claims that it already possesses thousands of documents proving exactly that. *See, e.g.*, Compl. ¶ 13 (alleging Honeywell submitted "over 100 examples" of inconsistencies to the NARCO Trust in 2017); *id.* ¶ 17 (alleging Honeywell submitted "approximately 1,500 additional examples of inconsistent affidavits" to the Trust in 2018 and 2019); *id.* ¶ 91 (same); *id.* ¶ 148 (alleging Honeywell cited 680 inconsistencies involving Nicholl Firm Affidavits); *id.* ¶ 150 (alleging Honeywell reported 738 examples involving Nicholl Firm clients to the Trust in 2019). Again, the Nicholl Firm disputes Honeywell's allegations that Nicholl Affidavits contain any such material inconsistencies. *See* § Bkgnd. § II, above. But assuming, for the sake of argument only, the truth of Honeywell's allegations about the evidence in its possession, those very allegations would demonstrate that Honeywell already has what it needs to address the issue it has raised in the underlying case.

## 2.      The Proposed Discovery is Unreasonably Cumulative and Duplicative

Honeywell argues that *if* the subpoenaed Nicholl Firm documents reveal "additional inconsistencies," on top of all the other evidence Honeywell claims it already possesses, that would further "buttress" Honeywell's claim, Honeywell Mem. at 8, but this is the very definition of a fishing expedition that seeks only unreasonably cumulative discovery. Honeywell does not suggest that it would be unable to prove its claims against the NARCO Trust without additional examples of the "inconsistencies" it believes are probative, nor does Honeywell offer any reason why it needs to ferret out every example of an "inconsistency," especially when it purports to already have thousands of such examples.

Even if Honeywell did dredge up more purported "inconsistencies" in the subpoenaed documents, the additional evidence would be unlikely to add much, if anything, to its case against the NARCO Trust.  Honeywell seeks prospective relief only—not damages. Judge Agresti made very clear that the bankruptcy court will hold Honeywell to its "representations" that it is not seeking "'damages' for any past actions of the Trust or any relief that would undo past actions of the Trust." Order at 3. Whatever marginal benefit Honeywell might obtain in arguing for a prospective injunction against "form affidavits" by finding additional "inconsistencies" pales in comparison to the massive burden that would be imposed on the Nicholl Firm by requiring it to search for broad categories of document for almost 14% of the firm clients who have received payments from the trust. Williams Decl. at ¶ 18.[10] There is no

---

[10] Given that in the underlying suit, Honeywell indisputably neither seeks damages nor to unravel the trust's actions, Honeywell is wrong to assert that there is a "considerable" "amount in controversy" weighing in favor of granting its motion to compel because "[t]he Trust has paid hundreds of millions of dollars in claims over the past eight years" and the Nicholl Firm's clients received a substantial portion of that money. Honeywell Mem. at 10. Honeywell does not seek to recover dollars paid by the trust, much less dollars paid to Nicholl Firm clients, so those previously paid sums are not in controversy.

explanation or rationale for such a large sample when Honeywell already claims to have extensive evidence.

### 3.   Honeywell Can Obtain Many of the Documents it Seeks from More Convenient, Less Burdensome, and Less Expensive Sources

Even assuming, *arguendo*, that the subpoenaed documents could strengthen Honeywell's case, substantial swathes of the documents Honeywell is seeking are already either in Honeywell's possession, or readily accessible to Honeywell from other, more convenient sources.

For example, Honeywell claims to possess extensive evidence of purported "inconsistencies" between claimants' affidavits and statements those claimants made in tort litigation. *See, e.g.*, Compl. ¶ 134 (alleging Honeywell possesses litigation materials in part because it is a defendant in many cases); *see also id.* ¶ 135-141 (citing examples of purported inconsistencies); *id*. at ¶ 142 (alleging Honeywell notified the NARCO Trust of 34 such "problematic claims"); *id*. at ¶ 144 (alleging Honeywell identified 77 examples of alleged inconsistencies involving Nicholl Firm clients). As Honeywell's own allegations demonstrate, Honeywell does not need to subpoena from the Nicholl Firm litigation materials from any case in which Honeywell is a party—as it has acknowledged, it already has access to such information. Yet more than 500 of the 1,629 claimants listed in the subpoena filed litigation against Honeywell. Williams Decl. ¶ 24.

By Honeywell's own account, then, this case is unlike *Strike 3 Holdings, LLC v. Doe*, No. 21-cv-2621 (RC/RMM), 2021 WL 4965567, at *4 (D.D.C. Oct. 26, 2021), on which Honeywell relies to suggest that the burden on the Nicholl Firm is not undue. Mem. at 11; *compare Strike 3*, 2021 WL 4965567, at *4 (finding third-party subpoena proportional where information asymmetry between the plaintiff serving the subpoena and the subpoenaed party was

"extreme" because the subpoenaed party could "readily retrieve the information" necessary for discovering the defendant's identity—the purpose of the subpoena—and the plaintiff "ha[d] no way to independently" do so).

### 4.    The Likely Benefit of the Proposed Discovery is Minimal at Best

Honeywell's subpoena to the Nicholl Firm goes to just one issue in the underlying case: whether so-called "form affidavits" should be barred, in the future, as "unreliable." Leaving aside the fact that Honeywell claims to already have plenty of evidence to prove its points, Judge Agresti has made clear that Honeywell will be severely limited in its ability to introduce the subpoenaed materials. *See* Bkgnd. § II.B, *supra*. For example, the Judge stated that he would not alter the previously-set limits on the trial length to enable any party to introduce "voluminous evidence… derived from the subpoena-based discovery." Agresti Order at 4. The Judge also emphasized repeatedly that Honeywell will not be able to use the evidence to attack prior claim approvals. Ex. 7 at 61:8-14 ("[W]e're not looking back. Honeywell is on record, saying we're not doing a nunc pro tunc… review of the Trust action."); *id*. at 67:1-2 ("[T]he past claims, Honeywell has already said that's out. And I'm going to hold it to that."); *see also id.* at 75:15 ("we're not going to revisit" paid claims); Ex. 8 (Agresti Order) at 3. Honeywell also will not be able to use the evidence unless it first proves that the Trust altered its policy on "form" affidavits—a fact very much in dispute. Ex. 7 at 78:3-18. Nor will Honeywell be allowed to use against the NARCO Trust any documents that were never submitted to the Trust (because claimants had no obligation under the TDP to submit them), *id.* at 80:21-81:2—but Honeywell's subpoena, at least as narrowed in the parties' meet and confer, seeks *only* documents that were never submitted to the Trust. Reynolds Decl. ¶¶ 4-5. All of these limitations raise serious doubt as to whether Honeywell will be able to use *any* of the documents responsive to the subpoena in

the adversary proceeding. And even if it can, Honeywell has other issues to prove, as well—and all within just 20 hours of trial time. Ex. 7 at 69:24-25.

Thus, even if Honeywell found substantial additional evidence of "inconsistencies," it is likely to be severely hampered in its ability to present that evidence to the Court—making the burden on the Nicholl Firm to produce these voluminous documents even more unjustifiable.[11]

### C.     The Court Should Not Enable Honeywell's Use of the Subpoena Mechanism for an Improper Purpose.

It is worth emphasizing that the Nicholl Firm is not on trial in the case underlying Honeywell's subpoena; neither are the Firm's clients. Honeywell traded its right to discovery from these claimants for the protections of the channeling injunction and the settlement trust-including the provisions extinguishing claimants' right to pursue punitive damages. Under the TDP, moreover, Honeywell agreed that it would have no right, directly, to audit the Nicholl Firm or its clients and that instead, claim audits would be conducted exclusively by Mazars pursuant to the Audit Program procedures to which Honeywell also agreed. Mazars has audited 550 Nicholl Firm claims to date, and the Nicholl firm has passed every Mazars audit that has been conducted. The Nicholl Firm complied fully with the NARCO Audit Program. It did so, on its clients' behalf, on the express understanding that the NARCO Trust and Honeywell have distinct audit rights as defined in the TDP and the Audit Program—which also limits the scope of the

---

[11] It is worth noting that Honeywell also could not use the subpoenaed materials to drum up claims against the Nicholl Firm, since any responsive materials would be produced only subject to the protective order entered in the adversary proceeding, which prohibits confidential materials from being used for any purpose other than the adversary proceeding. Confidentiality Stipulation and Protective Order, Dkt. 123, *Honeywell Int'l Inc. v. North American Refractories Company Asbestos Personal Injury Settlement Trust*, Adv. Proc. No. 21-2097 (Bankr. W.D. Pa.) (Nov. 18, 2021) at § 2.1. Moreover, on the meet and confer call about the Nicholl Firm's objections to the subpoena, Honeywell's counsel represented that Honeywell is not seeking these materials in order to sue the Nicholl Firm. Reynolds Decl. ¶ 6.

information Honeywell is entitled to obtain in connection with claim audits. *See* Ex. 4 at 6 (Auditor required to return to law firm all documents and information produced in response to audit inquiry; such materials are not provided to the Trust or Honeywell); *id.* (providing that Audit Program is not intended to expand rights Honeywell has under TDP). Honeywell may not agree with the outcome of the procedures it agreed to, but it has no right under the TDP or the Audit Program to sidestep them and conduct its own audits—much less to unilaterally select a substantially larger sample and effectively conduct new audits.

Honeywell is evidently unhappy that the NARCO Trust rejected Honeywell's suggestion to ignore the existing procedures and "conduct a sampling" from the Nicholl Firm and other firms, Compl ¶ 143. But it may not subvert the TDP or the Audit Program procedures, not to mention the channeling injunction, by misusing non-party discovery in its adversary case against the NARCO Trust. Honeywell's subpoena, transparently, seeks to conduct the sampling Honeywell requested and was denied, and which Honeywell has no right to undertake on its own. The Court should not allow Honeywell to abuse the non-party subpoena mechanism to obtain discovery or audit rights that exceed those to which it is entitled as consideration for its bankruptcy protections.

\*   \*   \*

In sum, Honeywell's subpoena seeks to impose on the Nicholl Firm, a non-party, the obligation to provide excessively burdensome discovery that is not at all proportional to the needs of the underlying action—and on an expedited basis, no less. As a result, the subpoenaed discovery imposes an undue burden on the Nicholl Firm, and the Court must deny Honeywell's motion to compel. Fed. R. Civ. P. 45(d)(3)(A)(iv); *see also, e.g.*, *In re Vitamins Antitrust Litig.*, 198 F.R.D. 296, 301-02 (D.D.C. 2000) (plaintiffs' transaction data, while marginally relevant,

need not be produced because the benefit to defendants of having the data was outweighed by the burden to plaintiffs of producing it).

## CONCLUSION

For the reasons set forth above, the Court should deny Honeywell's Motions to Compel, Transfer, and Expedite Proceedings.

Dated:  December 23, 2021                    Respectfully Submitted,

**ZUCKERMAN SPAEDER LLP**

By:     /s/ Caroline E. Reynolds
Caroline E. Reynolds (Bar No. 489767)
Carl S. Kravitz (Bar No. 357376)
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: 202.778.1800
Fax: 202.822.8106
creynolds@zuckerman.com
ckravitz@zuckerman.com